

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

**KAREN BAKA,**

    **Plaintiff,**

v.                                       **CIVIL ACTION NO. 2:21-cv-419**

**CITY OF NORFOLK,
VIRGINIA,**

    **Defendant.**

## *MEMORANDUM OPINION AND ORDER*

Before the Court is Defendant City of Norfolk, Virginia's ("Defendant" or "Norfolk") Motion to Dismiss. Def.'s Mot. Dismiss, ECF No. 4. Defendant moves to dismiss Count III and Count IV of the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). *Id.* The Court has considered the memoranda of the parties and this matter is now ripe for determination. *See* Def.'s Mem. Supp. Mot. Dismiss, ECF No. 5 ("Def.'s Mem. Supp."); Pl.'s Mem. Opp. to Def.'s Mot. Dismiss, ECF No. 9 ("Pl.'s Mem. Opp."); Def.'s Reply to Pl.'s Mem. Opp. to Def.'s Mot. Dismiss, ECF No. 10 ("Def.'s Reply"). Upon review, the Court finds that a hearing on this Motion is not necessary. *See* E.D. VA. LOCAL CIV. R. 7(J). For the reasons stated herein, Defendant's Motion to Dismiss is **DENIED IN PART and GRANTED IN PART**.

                **I.**     **FACTUAL AND PROCEDURAL HISTORY**

Plaintiff Karen Baka ("Plaintiff" or "Baka") filed a Complaint against Defendant alleging hostile work environment and sexual harassment, retaliation, sex discrimination, and whistleblower protection claims. Compl., ECF No. 1. Relevant to Defendant's Motion to Dismiss and stated in the light most favorable to Plaintiff, the following facts are drawn from the Complaint and attachments thereto. *See Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982).

1

Plaintiff is a female who, at all times relevant to the Complaint, was an individual and resident of Virginia Beach, Virginia, and an employee of the City of Norfolk. Compl. at ¶¶ 1, 11. Defendant is a municipal corporation employing more than 500 individuals in the Norfolk, Virginia area. *Id.* at ¶ 2. Plaintiff began working for Norfolk as a firefighter and paramedic in July of 2005. *Id.* at ¶ 9. In 2012, Plaintiff accepted a position in the Norfolk Fire Marshall's Office as a fire inspector. *Id.* at ¶ 10. That same year, Plaintiff achieved the rank of Fire Investigator with the Norfolk Fire Marshall's Office. *Id.*

Plaintiff alleges that the Norfolk Fire Marshall's Office has historically been dominated by men, including at leadership and management levels. *Id.* at ¶ 12. At all times relevant to the Complaint, Chief Roger Burris, Chief Jeffrey Wise, Chief Michael Brooks, and Captain Michael Rose were all male employees of Norfolk and Plaintiff's direct supervisors. *Id.* at ¶ 13. Plaintiff alleges that male supervisors in the Norfolk Fire Marshall's Office, including the four named supervisors, routinely acted with hostility toward the few female fire investigators working in the office, including Plaintiff. *Id.* at ¶ 14. Rose, Burris, Brooks, Wise, and other male supervisors would require female investigators, including Plaintiff, to have a male coworker present with them during law enforcement activities, yet permitted similarly situated and less-experienced male coworkers to conduct these activities alone. *Id.* at ¶ 15. Rose, Wise, Brooks, and other male supervisors would routinely deny Plaintiff and other female fire investigators the opportunity to attend extra work-related educational events and training opportunities, but would allow similarly situated male coworkers to participate. *Id.* at ¶ 16. Plaintiff alleges that, as a direct and proximate result, she lost the opportunity for valuable training and experience in commercial fire code investigation and enforcement, which hampered her career advancement. *Id.*

Rose and Burris also regularly made hostile, sexist statements to Plaintiff and other

female employees during work. *Id.* at ¶ 17. For instance, Plaintiff noticed that male coworkers with the same or less seniority than her in the department were assigned new city-issued work trucks. *Id.* When Plaintiff inquired as to when she might be assigned a new city-issued truck, Rose responded, "Girls will get trucks when girls can drive trucks." *Id.* Rose also made sarcastic verbal comments to another female fire investigator, Renee Criswell. *Id.* at ¶¶ 18-19. On one occasion, Criswell met with Rose, her supervisor, and stated she had the qualifications to work as a bomb squad technician. *Id.* at ¶ 18. Rose laughed at her and told her in a demeaning manner that the bomb squad job required "working with heavy equipment." *Id.* When a male investigator expressed interest in the job, Rose did not make any such remarks. *Id.*

On multiple occasions during staff meetings, Plaintiff or Criswell would express knowledge-based concerns about work issues. *Id.* at ¶ 20. In response, Rose and other male supervisors would tell them that the meeting was not a "bitch session." *Id.* They made no such comments to similarly situated male employees. *Id.* Moreover, Plaintiff alleges Norfolk would routinely assign less desirable job duties to female fire inspectors, such as bed bug complaints and suspected hoarders. *Id.* at ¶ 21. Conversely, Defendant would assign more desirable jobs to similarly situated male coworkers, such as hood inspections, school inspections, and training opportunities. *Id.* Plaintiff alleges that, as a result, her male coworkers obtained more inspection credits, which are necessary for career advancement. *Id.*

Throughout her employment at the Norfolk Fire Marshall's Office, Plaintiff alleges that Burris routinely propositioned her into a sexual relationship with him and she refused his advances. *Id.* at ¶ 22. Plaintiff alleges Burris would verbally communicate and send her text messages in which he professed his love for her. *Id.* at ¶ 23. If Plaintiff did not respond to Burris's emails, he would retaliate against her by altering her working conditions and

complaining that she was "ignoring him." *Id.* at ¶¶ 23-24.

Plaintiff made a written complaint to Defendant complaining of gender discrimination in the Fire Marshall's Office, including complaints to Wise and Brooks regarding the conduct of Burris and Captain Ansell. *Id.* at ¶ 25. Burris remained the Fire Marshall for Norfolk until July of 2018. *Id.* Following her complaints, Burris approached her and several other coworkers, unannounced, and asked them in an angry tone whether they had the "testicles and ovaries" to tell him "what was going on" with the complaints against him. *Id.* at ¶ 26. Burris also had a meeting with then-employees Scott Phillips Gartner and Karen Barnes, during which Burris told them that if anyone "went behind his back" then they would "feel [his] wrath." *Id.* at ¶ 27.

On June 5, 2018, Criswell made a complaint to her supervisor, Lieutenant Eric Phillips, that Rose engaged in gender discrimination against her and Plaintiff. *Id.* at ¶ 28. As a result of Criswell's complaint, Defendant asked Plaintiff to meet with Norfolk Fire and Rescue's Office of Professional Standards Officer Captain Nicholas Nelson and City of Norfolk Human Resource Specialist Erika Petty for an "informal inquiry" as to the treatment of women in the Norfolk Fire Marshal's Office. *Id.* at ¶ 29. Plaintiff met with Nelson and Petty on August 3, 2018. *Id.* at ¶ 30. During the meeting, Nelson asked Plaintiff if she had experienced gender discrimination by Rose, to which Plaintiff affirmatively answered and provided several examples. *Id.* In 2018, Wise received the results of the "informal inquiry." *Id.* at ¶ 31. After Plaintiff issued her complaints and the "informal inquiry" concluded, Plaintiff was not offered any mediation and Rose did not change his behavior. *Id.* at ¶ 32. Rather, after the meeting on August 3, 2018, Plaintiff experienced a significant increase in hostile treatment from Rose. *Id.* at ¶ 33. Plaintiff alleges that, after the meeting, Rose would become angry, hostile, condescending, and would yell at her when she would ask him a question. *Id.* She alleges this conduct became progressively

4

worse over time. *Id.* Plaintiff also applied for a promotion to the position of Assistant Fire Marshall in October 2017, March 2018, and November 2018. *Id.* at ¶ 34. Each time, Plaintiff alleges that Defendant promoted a male coworker with less seniority, less job-related experience, and less job-related education than she had. *Id.*

On August 30, 2019, Plaintiff filed a complaint for gender discrimination in employment against Defendant in this Court. *Id.* at ¶ 35. On October 24, 2019, a local television station published a news story about gender discrimination in the Norfolk Fire Marshall's Office, which provided details about Plaintiff's lawsuit and another lawsuit Barnes filed alleging gender discrimination.[1] *Id.* at ¶ 36. A few weeks later, on November 15, 2018, and on November 22, 2019, Defendant required Plaintiff to take multiple drug tests. *Id.* at ¶ 37. Rose accompanied Plaintiff to one of the drug tests. *Id.* Defendant had never required Plaintiff to take a drug test since hiring her in 2005. *Id.* Defendant also required Criswell to submit to a "random" drug test soon after she complained of gender discrimination in 2018. *Id.*

Following the lawsuit, news story, and drug tests, Plaintiff alleges that Rose's gender-based hostile conduct toward her intensified. *Id.* at ¶ 38. Specifically, Plaintiff alleges Rose would leave her out of important intra-department correspondence to the point that she felt ostracized and shunned by management. *Id.* When Rose would communicate with her, he would often become easily angered and yell at her over minor issues. *Id.* Rose did not exhibit such behavior toward similarly situated male employees. *Id.* On December 19, 2019, Rose sent a work-related text message to all of the male fire investigators, but specifically excluded Plaintiff and Criswell – the only two female investigators left in the department. *Id.* at ¶ 39.

---

[1] *See* Jason Marks, *Special Report: Norfolk Under Fire for Treatment of Female Employees*, WAVY.com (Oct. 24, 2019, 4:11 PM), https://www.wavy.com/news/local-news/norfolk/special-report-norfolk-under-fire-for-treatment-of-female-employees/ (link provided in Plaintiff's Complaint). For the purposes of a Rule 12(b)(6) motion, courts may rely upon documents incorporated by reference in the complaint. *See Simons v. Montgomery Cnty. Police Officers*, 762 F.2d 30, 31 (4th Cir. 1985).

Rose and the Norfolk Fire Marshall's Office required female investigators to strictly adhere to a policy requiring they wear a full uniform when appearing to testify in court proceedings. *Id.* at ¶ 40. Defendant did not require similarly situated male employees to adhere to the purported mandatory dress policy. *Id.* On November 19, 2019, and November 20, 2019, a male fire investigator appeared in court for trial testimony without wearing his full uniform. *Id.* at ¶ 41. Rose and two male lieutenants were present in court during these trial dates and were aware that the male employee did not wear his full uniform, but they did not reprimand him. *Id.* During that same period, however, Rose and Defendant demanded that Plaintiff and Criswell strictly adhere to the dress policy and disciplined them for violating it. *Id.* at ¶ 42.

On April 27, 2020, Plaintiff alleges Rose continued to display hostility, retaliation, and gender discrimination against her at the scene of a fire in which Plaintiff was the lead investigator. *Id.* at ¶ 43. Plaintiff alleges that Rose came upon the scene, belittled her in front of coworkers, and told her coworkers, "I am the captain. I outrank her. I am going to make sure she knows that I do." *Id.* Rose then ordered Plaintiff to perform punitive physical labor. *Id.* Rose did not order a similarly situated male investigator to perform such physical labor and advised him, in Plaintiff's presence, that he could relax as Plaintiff worked by herself. *Id.* Captain Wayne Oporto, who was present at the scene, made a verbal and written complaint to his supervisor about how offended he was by witnessing Rose's conduct toward Plaintiff. *Id.*

From November 15, 2019 through June of 2020, Plaintiff alleges that Defendant regularly charged her and other female employees for sick leave or vacation time for any time off, but, did not do the same to similarly situated male employees. *Id.* at ¶ 44. On January 6, 2020, Plaintiff alleges that she and Criswell were verbally reprimanded for not answering phone calls from a lieutenant when they were off duty and not on call. *Id.* at ¶ 45. Defendant did not reprimand any

6

similarly situated male employees for failing to answer such calls. *Id.* On January 13, 2020, Plaintiff alleges that Lieutenant Phillips, who is a male, advised her during a work meeting that she was "being watched by all of the supervisors" because of the lawsuit. *Id.* at ¶ 47. In July of 2020, Plaintiff alleges that a male fire investigator was issued his own personal work office while she was required to conduct office work in a public workspace. *Id.* at ¶ 46. Plaintiff alleges that private office space is a more favorable work condition and Defendant normally assigns such private office space by seniority. *Id.* Plaintiff states she has significant seniority over her male coworker yet was denied a private office in his favor. *Id.*

Accordingly, Plaintiff asserts five counts against Defendant:

- Count 1. Title VII – Hostile Work Environment and Sexual Harassment (Compl. at ¶¶ 48-55);
- Count 2. Title VII – Retaliation (Compl. at ¶¶ 56-64);
- Count 3. Sex Discrimination – Virginia Code §§ 2.2-3905 and 2.2-3908 (Compl. at ¶¶ 65-71);
- Count 4. Retaliation – Virginia Code § 40.1-27.3 (Compl. at ¶¶ 72-76); and
- Count 5. Whistleblower Protection Act – Virginia Code § 2.2-3011 (Compl. at ¶¶ 77-83).

Plaintiff demands a trial by jury and seeks relief in the form of: (1) lost salary and benefits, plus interest; (2) lost future salary and benefits; (3) compensatory damages for emotional pain and suffering, stress, inconvenience, and loss of enjoyment of life; (4) compensatory and punitive damages pursuant to Virginia Code § 2.2-3908; and (5) attorney's fees and costs. Compl. at 18. Defendant moves to dismiss Counts III and IV pursuant to Federal Rule of Civil Procedure 12(b)(6). *See* Def.'s Mot. Dismiss; Def.'s Mem. Supp.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of actions that fail to

7

state a claim upon which relief can be granted. For the purposes of a Rule 12(b)(6) motion, courts may only rely upon the complaint's allegations and those documents attached as exhibits or incorporated by reference. *See Simons v. Montgomery Cnty. Police Officers*, 762 F.2d 30, 31 (4th Cir. 1985). Courts will favorably construe the allegations of the complainant and assume that the facts alleged in the complaint are true. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). However, a court "need not accept the legal conclusions drawn from the facts," nor "accept as true unwarranted inferences, unreasonable conclusions, or arguments." *E. Shore Mkts., Inc., v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000).

A complaint need not contain "detailed factual allegations" in order to survive a motion to dismiss, but the complaint must incorporate "enough facts to state a belief that is plausible on its face." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008). This plausibility standard does not equate to a probability requirement, but it entails more than a mere possibility that a defendant has acted unlawfully. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009). Accordingly, the plausibility standard requires a plaintiff to articulate facts that, when accepted as true, demonstrate that the plaintiff has stated a claim that makes it plausible he is entitled to relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Iqbal*, 129 S. Ct. at 1949, and *Twombly*, 550 U.S. at 557). To achieve factual plausibility, plaintiffs must allege more than "naked assertions ... without some further factual enhancement." *Twombly*, 550 U.S. at 557. Otherwise, the complaint will "stop[ ] short of the line between possibility and plausibility of entitlement to relief." *Id*.

### III. DISCUSSION

Pursuant to Federal Rule of Civil Procedure Rule 12(b)(6), Defendant moves to dismiss Plaintiff's state law claims under Counts III and IV. *See* Def.'s Mot. Dismiss; Def.'s Mem. Supp.

### A. Sovereign Immunity – Count Three and Count Four

#### 1. Municipal Governmental v. Proprietary Functions Under Virginia Law

Defendant moves to dismiss Counts III and IV as barred under the doctrine of sovereign immunity. Def.'s Mem. Supp. at 3. Under Virginia law, "[i]t is well established that the doctrine of sovereign immunity protects municipalities from tort liability arising from the exercise of governmental functions." *Niese v. City of Alexandria*, 264 Va. 230, 238 (2002) (citing *Hoggard v. City of Richmond*, 172 Va. 145, 147-48 (1939)). "Unlike counties, which share fully in the sovereign's immunity from tort, whether a municipal corporation is entitled to sovereign immunity protection depends on the type of function it exercises when liability arises." *Massenburg v. City of Petersburg*, 298 Va. 212, 218 (2019) (internal citations omitted). "Under longstanding principles, sovereign immunity protects municipalities from tort liability arising from governmental functions, but not proprietary functions." *Id.* (citing *City of Chesapeake v. Cunningham*, 268 Va. 624, 634 (2004); *City of Richmond v. Long's Adm'rs*, 58 Va. 375, 378-79 (1867)). "A municipality engages in a governmental function when it exercises powers and duties exclusively for the public welfare, effectively acting 'as an agency of the state to enable it to better govern that portion of its people residing within its corporate limits.'" *Id.* (quoting *Hoggard*, 172 Va. at 147). On the other hand, a municipality engages in a propriety function when it exercises "its powers and privileges primarily for its own benefit." *Id.* (citing *City of Virginia Beach v. Carmichael Dev. Co.*, 259 Va. 493, 499 (2000); *Hoggard*, 172 Va. at 148). Indeed, a municipality is not immune from liability for "these ministerial activities even though 'the general public may derive a common benefit' from their performance." *Id.* (quoting *Hoggard*, 172 Va. at 148). The test for establishing a proprietary function is "whether, in providing such services, the governmental entity is exercising the powers and duties of

9

government conferred by law for the general benefit and well-being of its citizens." *Edwards v. City of Portsmouth*, 237 Va. 167, 172 (1989).

Defendant argues Plaintiff's allegations arise out of the City's operation of the City of Norfolk Fire Department. Def.'s Mem. Supp. at 3. Relying on the Supreme Court of Virginia's decision in *Massenburg*, Defendant argues operating a fire department is a governmental function, thus rendering them immune under sovereign immunity. *Id.* (citing *Massenburg*, 298 Va. at 218). Yet, the *Massenburg* court further explained that the operation of a fire department is a governmental function "because firefighting falls within a municipality's power and duty to provide emergency services 'for the general safety and welfare of the citizenry.'" 298 Va. at 218-19; *see also Long's Adm'rs*, 58 Va. at 375 (city-provided hospital services are a governmental function); *Ashbury v. Norfolk*, 152 Va. 278 (1929) (city-provided garbage collection is a governmental function because it concerns the preservation of public health); *Edwards*, 237 Va. at 171 (city-provided ambulance services are a governmental function because they are directly tied to the health, safety, and welfare of citizens); *Carter v. Chesterfield County Health Com'n*, 259 Va. 588, 594 (2000) (county-commission-operated nursing services are a governmental function because they are an exercise of the county's police power for the common good).

The "operation of a fire department," standing alone, is vague. In other cases, the Supreme Court of Virginia has made distinctions regarding the functions of fire departments. *Compare City of Richmond v. Virginia Bonded Warehouse Corp.*, 148 Va. 60, 70-71 (1927) (city not entitled to sovereign immunity for fire department employee's negligence in installing the fire department's own sprinkler because it was for their own private benefit and therefore proprietary), *with Massenburg*, 298 at 221 (city entitled to sovereign immunity because providing and maintaining fire hydrants exists to facilitate the firefighting function, which is

quintessentially governmental). However, Defendant and the Supreme Court of Virginia have not defined "the operation of a fire department," specifically. In *Hoggard*, rather, the court merely mentioned, without citing to precise authority, that "the operation of fire departments" has been held to be a function rendering a municipality immune from suit. 172 Va. at 154. Defendant also cites to *Hobby v. Beneficial/Household Member HSBC*, in which the court found that sovereign immunity "extends to municipalities in the exercise of their governmental functions, several of which are certainly the maintenance of police and fire departments." No. CIV.A. 2:05CV238, 2005 WL 5409004, at *3 (E.D. Va. Aug. 12, 2005), *aff'd sub nom. Hobby v. Beneficial/Household Member HSBC Grp.*, 182 F. App'x 238 (4th Cir. 2006) (citing *Hoggard* to support the reference to maintenance of fire departments, specifically). This District's reliance on *Hoggard*, however, still does not elucidate the definition of "operation."

The closest indication the Court has of what constitutes the "operation of a fire department" comes from *Massenburg*, in which the Supreme Court of Virginia explained that it is a governmental function "because firefighting falls within a municipality's power and duty to provide emergency services 'for the general safety and welfare of the citizenry.'" 298 Va. at 218-19 (quoting *Gambrell*, 267 Va. at 359 (analyzing municipal corporation liability in a personal injury "slip and fall" accident in a city-owned parking lot)). Without a precise definition, the Court determines whether Plaintiff's claims relate to the "operation of a fire department" according to the test that the *Edwards* court set out: "whether, in providing such services, the governmental entity is exercising the powers and duties of government conferred by law for the general benefit and well-being of its citizens." 237 Va. at 172.

Defendant has not identified any political, discretionary, or legislative authority that granted it power to set the terms and conditions of employment within the Norfolk Fire

Department. *See Nieves*, 264 Va. at 239. Moreover, Defendant has not argued, and the Court cannot decipher, how doing so would be "for the general benefit and well-being of its citizens." *Edwards*, 237 Va. at 172. Indeed, Plaintiff's claims do not obviously relate to a fire department's "power and duty to provide emergency services" for the public. *Massenburg*, 298 Va. at 218-19. Especially since Plaintiff's sex discrimination claim does not challenge Defendant's decision to hire or fire her, the Court also finds this distinct from, for instance, the maintenance of a police force. *See Nieves*, 264 Va. at 240 ("The decision to retain an individual police officer is an integral part of the governmental function of maintaining a police force."). While Plaintiff alleges Defendant "discriminated against [her] in the terms and conditions of her employment because of her sex" and that she "suffered damages including denial of job promotions [and] *constructive* termination of employment," Plaintiff's sex discrimination claim is ultimately based on the conditions, rules, and treatment she faced during the course of her employment. Compl. at ¶¶ 68, 70 (emphasis added). Count IV of the Complaint is quite similar in nature. Specifically, Plaintiff alleges "Norfolk disciplined, threatened, discriminated against and penalized [her] in direct retaliation for [her] reporting violations" under Title VII of the Civil Rights Act and of its own anti-gender discrimination policy. Compl. at ¶ 73.

The Court finds these intra-department conditions are too remote from the public interest and welfare to constitute a government function. *See Virginia Bonded Warehouse*, 148 Va. at 72. Rather, the Court finds that the harms alleged relate to and derive from terms and conditions of employment, which are private benefits and interests of the employers and employees of the fire department, and therefore constitute a proprietary function. *See id.* at 72-73. Defendant is not immune from liability "for these ministerial activities even though 'the general public may derive a common benefit' from their performance.'" *Massenburg*, 298 Va. at 218 (quoting

*Hoggard*, 172 Va. at 148). Accordingly, the Court finds that "the municipality is liable in the same manner as a private individual." *Virginia Bonded Warehouse*, 148 Va. at 70.

    2. <u>Waiver of Sovereign Immunity</u>

Defendant also claims that it is "immune from tort liability for governmental functions, absent an express waiver of such immunity." Def.'s Mem. Supp. at 4. Yet, the Supreme Court of Virginia in *Massenburg* – a case upon which Defendant relies – explicitly stated: "Unlike counties, which share fully in the sovereign's immunity from tort, whether a municipal corporation is entitled to sovereign immunity protection depends on the type of function it exercises when liability arises." 298 Va. at 218 (2019). Indeed, Defendant's reliance on *Ligon* is misplaced because that case dealt specifically with a county employee who brought suit against the county for which he worked. *See Ligon v. Cnty. of Goochland*, 279 Va. 312, 314 (2010). The *Massenburg* court made clear that counties enjoy immunity protections distinct from those enjoyed by municipalities. Defendant is a municipality, not the Commonwealth or one of its counties. The Court therefore finds Defendant's waiver argument regarding Counts III and IV to be without merit.

Accordingly, Defendant's Motion to Dismiss Counts III and IV of the Complaint is **DENIED**.[2]

    **B. Punitive Damages**

Defendant also moves to dismiss Plaintiff's claim for punitive damages as barred against municipalities. Def.'s Mem. Supp. at 8-9. "Judicial disinclination to award punitive damages

---

[2] Defendant argues Plaintiff has abandoned her claim to Count III and, as will be discussed *infra*, to her claim for punitive damages, because she did not address them in her memorandum in opposition. Def.'s Reply at 1-2. The Court acknowledges it has the discretion to treat those arguments as conceded. *See Burke v. CHS Middle E., LLC*, No. 1:18-CV-01605-LO-JFA, 2019 WL 459022, at *5 (E.D. Va. Feb. 4, 2019); *Chamblee v. Old Dominion Sec. Co., L.L.C., et al.*, No. 3:13CV820, 2014 WL 1415095, at *8 (E.D. Va. Apr. 11, 2014) (noting that when a plaintiff addresses only some, not all, arguments in opposition to a motion to dismiss, a court may treat those unaddressed arguments as conceded). However, the Court declines to exercise such discretion here.

against a municipality has persisted to the present day in the vast majority of jurisdictions." *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 260 (1981) (collecting cases). This disinclination derives from the notion that "[a]n award of punitive damages against a municipal government does not punish the wrongdoer." *McConnell v. Hampton Roads Sanitation Dist.*, 5 Va. Cir. 149 (1984), *aff'd sub nom. Hampton Roads Sanitation Dist. v. McDonnell*, 234 Va. 235, 360 S.E.2d 841 (1987). "Instead it punishes only the taxpayer who took no active part in the wrongful act." *Id.* "Thus, it becomes simply a windfall to a plaintiff who has already been fully compensated." *Id.* "Furthermore, it does not deter future misconduct as effectively as a personal action against the offending municipal official would, and it may on occasions risk the financial integrity of the municipal government." *Id.*; *see also Cleaves-McClellan v. Shah*, 93 Va. Cir. 459 (2016) ("[M]unicipalities [] are immune from punitive damages."); *Cunningham*, 268 Va. at 640 (reversing a trial court judgment that failed to dismiss a plaintiff's claim of punitive damages against a city). The Court therefore finds that, although the City of Norfolk is not immune from suit, it is immune from punitive damages.

Accordingly, Defendant's Motions to Dismiss Plaintiff's claim for punitive damages is **GRANTED**.

## IV. CONCLUSION

For the reasons set forth above, Defendant's Motion to Dismiss is **DENIED IN PART and GRANTED IN PART**. The Court **DIRECTS** the Clerk to provide a copy of this Order to the parties.

**IT IS SO ORDERED.**

Norfolk, Virginia
March 11, 2022

/s/
Raymond A. Jackson
United States District Judge

14